UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Charles H. Emery,

     Plaintiff,

     v.                                                    Civil Action No. 1:11-CV-65

Michael J. Astrue, Commissioner,
Social Security Administration,

     Defendant.

## REPORT AND RECOMMENDATION
(Docs. 21, 33)

     Plaintiff Charles Emery brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner

of Social Security ("Commissioner") denying his application for disability insurance

benefits.  Pending before the Court are Emery's Motion for Order Reversing the

Commissioner's Decision (Doc. 21), and the Commissioner's Motion for Order

Affirming the Commissioner's Decision (Doc. 33).  For the reasons stated below, I

recommend that Emery's Motion be DENIED; and the Commissioner's Motion be

GRANTED.

## Background

     Emery was thirty-five years old on the alleged disability onset date of

September 10, 2005.  (AR 114.)  Emery completed the eleventh grade and has held a

number of jobs ranging from truck driver to auto mechanic.  (*Id.* at 120, 187.)  In 2005,

Emery stopped working due to pain in his lower back and right leg.  (*Id.* at 119, 677.)

In February 2007, Emery filed an application for disability insurance benefits.

(AR 100.)  According to Emery, on September 10, 2005, his alleged onset date, he began

experiencing pain after he drove over a pothole in a truck he was driving.  (*See id.* at 100,

677.)  In support of this application, Emery claimed a herniated disc, degenerative disc

disease, and depression.  (*Id.* at 119, 128, 683-84.)  Emery's application was denied

initially and on reconsideration.  (*Id.* at 48-51.)

On January 12, 2010, Administrative Law Judge Edward G. Hoban ("ALJ")

conducted a hearing on Emery's application.  (AR 670.)  At the hearing, Emery was

represented by counsel and testified on his own behalf.  (*Id*.)  On May 28, 2010, the ALJ

issued a decision finding Emery not disabled under the Social Security Act.  (*Id.* at 19.)

The Decision Review Board subsequently affirmed the ALJ's decision, thus rendering it

final.  (*Id.* at 1.)  Having exhausted his administrative remedies, Emery commenced this

action on November 2, 2010.  (*See* Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability

claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step

requires the ALJ to determine whether the claimant is presently engaging in "substantial

gainful activity" ("SGA").  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not

so engaged, step two requires the ALJ to determine whether the claimant has a "severe

impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step commands that the ALJ determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, the ALJ first determined that Emery had not engaged in SGA since September 10, 2005, his alleged onset date. (AR 12.) Next, the ALJ found that Emery had the severe impairments of depression, disc disease of the lumbar spine, substance abuse disorder, and posttraumatic stress disorder ("PTSD"). (*Id.* at 13.) Proceeding to step three, the ALJ found that Emery did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (*Id.* at 14.) The ALJ then determined that Emery had the RFC to perform "light work as defined

in 20 CFR [§] 416.967(b) except [he was] limited to performing simple, repetitive unskilled work tasks and should avoid exposure to hazards." (*Id.* at 16.)  Relying on this assessment, the ALJ found that Emery could not perform his past relevant work as a salesman, automobile mechanic, or delivery worker.  (*Id.* at 18.)  Nevertheless, at step five, the ALJ determined that there were a significant number of jobs in the national economy that Emery could perform based on his age, education, work experience, and RFC.  (*Id.*)  Thus, the ALJ concluded that Emery had not been under a disability since the alleged onset date of September 10, 2005.  (*Id.*)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any SGA by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is restricted to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role in reviewing the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded [that] decision," *Hernandez v. Barnhart*, No. 05-9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (internal quotation marks omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

### <u>Analysis</u>

### I.      Equivalence to a Listed Impairment

Emery claims that the ALJ erred in his determination that Emery's spinal impairments did not meet or equal Listing 1.04, which relates to disorders of the spine. Emery advances several different arguments in support of his claim.

## A.  Discussion of Objective Medical Evidence

Emery first claims that the ALJ erred when he limited his discussion of Listing 1.04 to only three pieces of objective medical evidence at step three of the sequential analysis.  (*See* Doc. 28 at 18.)  Emery argues that "the ALJ did not mention the numerous medical tests and examination findings that supported a listings level finding of disability for the low back."  (*Id.*)  This claim lacks merit.

At step three of the sequential analysis, the ALJ is required to decide whether the claimant's impairment "meets or equals" an impairment in the Listings.  20 C.F.R. §§ 404.1520(d), 416.920(d).  For a claimant to successfully carry his burden of proof at this step, he "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).  If the claimant's impairment meets or equals a listed impairment, he is presumptively disabled.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

In his decision, the ALJ first considered medical equivalence to Listing 1.04, which pertains to disorders of the spine.  (*See* AR 14.)  Listing 1.04 includes three separate impairments: nerve root compression, spinal arachnoiditis, and lumbar spinal stenosis resulting in pseudoclaudication.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04.  For a claimant to establish equivalency in severity to one of these impairments, he must either show (1) "motor loss . . . accompanied by sensory or reflex loss," *id.* at § 1.04A; (2) "severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours," *id.* at § 1.04B; or (3) "chronic nonradicular pain and weakness . . . resulting in inability to ambulate effectively," *id.* at §

1.04C.  The ALJ acknowledged that Emery "has had some periods of decreased motor sensation," but ultimately concluded that his impairments do not meet or equal Listing 1.04 because he generally has normal motor functioning.  (AR 14.)  In support of this determination, the ALJ specifically discussed the reports of Drs. Cristin Jouve, Matthew Zmurko, and Holly Dunn, and observed that Emery had normal motor function and normal reflexes.  (*Id.* at 14, 310, 342, 496.)

Nevertheless, Emery claims that the ALJ failed to consider "the EMG nerve condition study on October 11, 2005 which showed electrophysiologic evidence of a right LR radiculopathy," as well as multiple MRIs, which show degenerative disc disease and central disc herniation at L5-S1.  (Doc. 28 at 18, 20; *see* AR 254, 343, 454, 526.)  Despite this evidence, when Dr. Zubin Batlivala examined Emery in November 2005, he observed that Emery was "able to stand up from a seated position and to ambulate," albeit, with an antalgic gait[1].  (AR 458.)  In December 2005, Dr. Uri Ahn noted that Emery had mostly "5/5 motor strength in the lower extremities L1-S1."  (*Id.* at 226.)  In January 2006, Dr. Batlivala again observed that Emery was able to ambulate, although he noted that Emery exhibited "an antalgic gait."  (*Id.* at 237.)  Approximately two months later, in March 2006, Dr. Batlivala wrote that Emery "was ambulating independently without any assistive device prior to his discharge[] and was extremely comfortable in terms of his pain level."  (*Id.* at 259.)  During the same month, Dr. Ahn examined Emery

---

[1] "Antalgic gait" is defined as "a characteristic g[ait] resulting from pain on weight-bearing in which the stance phase of g[ait] is shortened on the affected side."  STEDMAN'S MEDICAL DICTIONARY 781 (28th ed. 2006).

and recorded "5/5 motor strength . . . and negative straight leg raise bilaterally."  (*Id.* at 263.)

In April 2006, Dr. Clifford Levy noted that Emery was in "no obvious distress," and observed a "normal gait pattern," as well as a lack of "motor or sensory deficits." (AR 446.)  In June 2006, Dr. Andrew Forrest examined Emery and recorded that "[h]e move[d] slowly on and off the examining table," and had "normal lower extremity strength, tone, sensation, and deep tendon reflexes with the exception of an absent internal hamstring reflex on the left."  (*Id.* at 471.)  Later that year in August, Dr. Jouve reported that Emery "was able to go on walking expedition[s] on a few occasions," "walk[ed] two miles at a time," was not "in any acute distress," and had "no neurological deficits on examination except for decreased right L5 sensation."  (*Id.* at 310.)

Emery underwent a functional capacity examination ("FCE") in February 2007. (*See* AR 318.)  The FCE showed that Emery could continuously sit, and frequently climb, stand, walk, reach, grasp, or drive.[2]  (*Id.*)  The report noted that Emery asserted significant pain that "was not fully reflected in his movement patterns or postures."  (*Id.*) For example, the report documented that:

> During casual conversation and distracting test activity in a seated position, [Emery] preferred to sit on the edge of a standard living room chair with his forearms and elbows resting on his knees adopting a flexed posture in the lumbar spine.  He reported that this seemed to be a comfortable sitting position for him and he was able to maintain this position for periods of 20 to 30 minutes in [the examiner's] presence.  He rated his sustainable sitting

---

[2]  For the purposes of this FCE, "continuous" is defined as 67-100% of the time, and "frequent" is defined as 34-66% of the time.  (AR 318.)

posture as at least one hour.  Overall data and observation of his body mechanics indicates he is capable of frequent sitting activity.

(*Id.* at 319.)  Emery also stated during the examination that he was, at that time, driving 300 miles a week.  (*Id.* at 318.)  During the FCE, Emery exhibited the "ability to lift and carry at least 20-pound loads during testing from floor to waist height, waist to shoulder height, and carry[] in two hands for at least a thirty-foot distance."  (*Id.* at 319.)  Based on these observations, the report concluded that Emery "demonstrated light duty lift and carry capabilities."  (*Id.*)

After reviewing this collective evidence, Dr. Matt Masewic, a non-examining medical consultant, opined in March 2007 that Emery had medically determinable impairments "but not at listings level."  (AR 336.)  Dr. Masewic based this determination on the fact that he believed Emery was capable of either sitting or standing/walking for approximately six hours in an eight-hour workday.  (*Id.* at 330.)  In May 2007, non-examining medical consultant Dr. Kimberlee Terry agreed with Dr. Masewic's assessment.  (*Id.* at 338.)

In July 2007, Emery was examined by Dr. Zmurko, who observed that Emery "has good motions of his bilateral extremities except for some weakness in his right peroneal and his gastroc which [he] would grade as about 4/5."[3]  (AR 341.)  In a subsequent report dated August 3, 2007, Dr. Zmurko further documented Emery's "5/5 motor strength of his bilateral lower extremities," ability to "ambulate[] with a slightly antalgic gait on the

---

[3]  "Peroneal" is defined as "the small bone of the arm or leg."  STEDMAN'S MEDICAL DICTIONARY 1466 (28th ed. 2006).  "Gastroc," short for gastrocnemius, is defined as the "calf of the leg." *Id.* at 791.

right side," and general lack of "significant distress." (*Id.* at 342.) Similarly, a report from Dr. Robert Giering of Rutland Regional Medical Center in July 2007 stated that Emery "ambulates with a slightly shuffling gait," "can achieve full range of motion," and is "in no acute distress." (*Id.* at 367.) After examining Emery in August 2007, Dr. Zmurko noted Emery's asserted ability to "walk a mile before having to stop because of the back pain" (*id.* at 520), and opined in December 2008 that Emery's "disc herniation is not very significant" (*id.* at 528). Finally, in November 2008, Dr. Dunn provided that, "[a]lthough [Emery] states that he cannot move either leg, he . . . holds first his left and then his right leg up like a dancer when [she] asked to examine them." (*Id.* at 496.) Dr. Dunn also noted that Emery "actively flex[ed] and extend[ed] both legs, thrashing around on the stretcher" and that his "[m]otor strength and tone [was] 5/5 in both lower extremities in major muscle groups." (*Id.*)

Thus, the objective medical evidence indicates that Emery could ambulate effectively, did not suffer from motor loss, and did not need to frequently change position. Furthermore, the evidence cited by Emery does not establish medical equivalency to nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. (*See* Doc. 28 at 18, 20.) The ALJ's determination that Emery did not have an impairment or combination of impairments that met or medically equaled Listing 1.04, therefore, is supported by substantial evidence.

### B.    Subjective Accounts of Pain

Next, Emery claims that the ALJ erred when he failed to consider Emery's subjective accounts of pain for the purposes of a medical equivalency determination at

step three.  (Doc. 28 at 21.)  But Emery's subjective accounts of pain—no matter how severe—are inadequate to demonstrate equivalence to a listed impairment, *see Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 1999) (providing that an ALJ "considers medical evidence" when making this determination), and the ALJ's categorical exclusion of this evidence at step three was proper.  At step three, "[a]ny decision as to whether an individual's impairment or impairments are medically the equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary."  SSR 86-8, 1986 WL 68636, at *4 (1986), *superseded on other grounds*, SSR 91-7c, 1991 WL 231791 (Aug. 1, 1991).

Furthermore, the ALJ found Emery's subjective complaints of pain not credible. The ALJ reasoned that:

> [T]he medical evidence regarding his low back problem does not support the claimant's assertions of disabling severe pain present on a constant basis as he alleges.  He was released to full-time work in August 2006 as established in clinical records from Dr. Jo[u]ve who noted that by self-report, the claimant was able to lift 40 pounds and did lift 25 pounds in physical therapy [AR 310, 312].  Also, Dr. Jo[u]ve noted that the claimant reported being able to walk for up to an hour at a time and to stand for an hour as well.  Further, formal function capacity testing in February 2007 established that the claimant was able to function at a light exertional level. The state agency reviewing physicians concluded the claimant could perform light and medium exertion [*id.* at 330, 337].  The claimant's assertion that he took pills so as to make his performance during this testing better is not supported by any observations made during this prolonged testing procedure [*id.* at 318-28].  Dr. Zmurko also documented the claimant's self-reported ability to walk 1 mile in August 2007 [*id.* at 342]. Moreover, in October 2007 Psychiatric Nurse Practitioner Baylock noted the claimant's self report that he had good sleep, energy, motivation and

appetite [*id.* at 390]. In December 2008 Dr. Zmurko did not feel the claimant's disc problem was "very significant" and he recommended only nonsurgical treatment [*id.* at 528]. During this time, in October 2008 Dr. Dunn noted inconsistencies between the claimant's self-report of his symptoms, his behavior on examination, and clinical findings [*id.* at 496].

(AR 17.) Thus, the ALJ properly explained why he gave Emery's subjective accounts of pain less weight in reaching his conclusions.

###    C.    Closed Period of Disability

Emery also contends that the ALJ erred when he failed to consider a closed period of disability between September 10, 2005 and September 10, 2006 for purposes of medical equivalency at step three. (*See* Doc. 28 at 21.) Emery argues that during this period of time, his treating physicians, Drs. Ahn and Batlivala, opined that he could not work. (*Id.*) This claim is meritless.

At the outset, the Court notes that Emery did not raise the issue of a closed period of disability until the filing of this Motion. (*See* Doc. 28 at 21.) Typically, a court need not address such a claim when it is raised for the first time at this stage in the proceedings. *See Ghio v. Astrue*, No. 2:10-CV-62, 2011 WL 923419, at *19 (D. Vt. Mar. 1, 2011) ("Given [Plaintiff's] failure to raise this issue before the ALJ, and failure to amend h[is] claim to request a closed period of disability, the Court need not consider it.") Nevertheless, as the Commissioner has not challenged this issue, the Court will address it. *See Verdi v. Comm'r of Soc. Sec.*, No. 2:10-CV-135, 2011 WL 1361559, at *4 n.2 (D. Vt. Apr. 11, 2011) (holding that a court will broadly construe and liberally apply the Social Security Act to entertain such a claim if "[n]either party has raised or discussed

the issue of the propriety or effect of a claimant changing his or her alleged disability period at the level of a court's review of the ALJ decision").

The term disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1509, 416.920. "A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." *Carbone v. Astrue*, No. 08-CV-2376 (NGG), 2010 WL 3398960, at *13 n.12 (E.D.N.Y. Aug. 26, 2010) (internal quotation marks omitted).

Emery argues that "[b]efore [August 30, 2006], treating doctors had [him] completely out of work [because] he was severely restricted." (Doc. 28 at 21.) But Emery fails to provide a citation to the record in support of this proposition. Perhaps he refers to two New Hampshire Workers' Compensation Medical Forms completed by Drs. Ahn and Batlivala on December 27, 2005 and January 3, 2006, respectively. (*See* AR 230, 462.) In each of these forms, the treating doctor checked a box indicating that Emery lacked the capacity to work for his employer at that time. (*Id.*) Nevertheless, at step three, the question is not whether a claimant has the capacity to perform his current job. Rather, the question is whether a claimant's impairment "meets or equals" an impairment in the Listings. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). As previously discussed, there is substantial objective medical evidence to support a finding that

Emery's impairments did not meet or equal an impairment in the requirements of the Listings during the alleged disability period, including between September 10, 2005 and September 10, 2006. (*See* AR 226, 237, 259, 263, 458.) Furthermore, contrary to Emery's claim, these forms do not establish a continuous inability to work, as the record also contains evidence from Dr. Batlivala which cleared Emery to work in a limited capacity during this same period. (*See id.* at 451, 455.)

Thus, Emery has failed to establish that, between September 10, 2005 and September 10, 2006, he suffered a continuous combination of impairments that met or medically equaled a spinal disorder in the Listings and a remand is unnecessary. *See Warren v. Astrue*, No. 10-CV-500S, 2012 WL 32971, at *4 n.5 (W.D.N.Y. Jan. 6, 2012) (holding that remand is unnecessary when Plaintiff failed to satisfy burden of proof for closed period of disability claim).

### D.    Combined Effect of Physical and Mental Symptoms

Next, Emery claims that the ALJ erred when he failed to consider the combined effect of Emery's impairments for the purposes of medical equivalency at step three. (*See* Doc. 28 at 21.) This claim lacks merit.

In support of his claim, Emery cites the applicable regulations, which provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe

combination of impairments, we will determine that you are not disabled (*see* § 404.1520).

20 C.F.R. § 404.1523.  Although the plain language of this regulation pertains to the severity determination at step two of the sequential analysis, "[t]he Second Circuit has long required that the combined effect of all of a claimant's impairments must be considered in determining disability[,] and has repeatedly ruled that the [Social Security] Act requires [the Social Security Administration] to evaluate the combined impact on a claimant's ability to work of every impairment, regardless of whether each is considered severe." *See Dixon v. Sullivan*, 792 F. Supp. 942, 956 (S.D.N.Y. 1992).  Applied here, the objective evidence shows that Emery could ambulate effectively, did not suffer from motor loss, and did not need to change positions or posture more than once every two hours.  (*See* AR 226, 237, 259, 263, 458.)  It is clear, therefore, that a combination of Emery's physical and mental ailments did not cause an impairment that medically met or equaled Listing 1.04.

The ALJ also considered medical equivalency to Listings 12.04 and 12.08, which pertain to affective disorders and personality disorders, respectively.  In accordance with the regulations, "[i]f the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the ['paragraph B'] criteria of the listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler v. Astrue*, 546 F.3d 260, 266 (2d Cir. 2008).  If medical equivalency is not established,

"the reviewing authority will then assess the claimant's residual functional capacity." *Id.*

Both Listings 12.04 and 12.08 require medically documented findings that:

> B.  Result[] in at least two of the following:
> 1.  Marked restriction of activities of daily living; or
> 2.  Marked difficulties in maintaining social functioning; or
> 3.  Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.  Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04(B), 12.08(B).

In making his determination, the ALJ relied heavily on the FCE provided by Dr. Dean Mooney, a clinical psychologist who examined Emery in March 2010. (*See* AR 15.) Specifically, the ALJ cited Dr. Mooney's opinion that Emery had moderate limitations in his ability to concentrate and remember, understand, and carry out complex instructions. (*Id.* at 15, 665.) The ALJ noted that Emery "had some problems with chronic low back and right lower extremity pain which reasonably limit[ed] his ability to perform complex tasks." (*Id.* at 15.) Additionally, the ALJ determined that Emery displayed mild restriction in his activities of daily living based on his purported ability to maintain his finances, shop, and prepare meals. (*Id.* at 15, 657, 660.) The ALJ also found that Emery had mild difficulties with social functioning based on Dr. Mooney's opinion that he could interact appropriately with supervisors and his use of public transportation, ability to shop, and maintain a relationship with his fiancée. (*Id.* at 15, 657.) Based on these findings, which included the consideration of Emery's back impairments, the ALJ ultimately concluded that the "paragraph B" criteria were not satisfied because Emery's symptoms did not cause "at least two 'marked' limitations or

one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (*Id.* at 15.) Thus, the ALJ appropriately considered the combination of Emery's physical and mental ailments when determining medical equivalency to Listings 12.04 and 12.08 as well.

### E. Decompensation

Emery contends that the ALJ's finding that he had not experienced repeated episodes of decompensation, each of extended duration, is not supported by substantial evidence. (*See* Doc. 28 at 23.) On the contrary, the ALJ was correct in his conclusion. The regulations define episodes of decompensation as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Id.* at § 12.00(C)(4). These occurrences "may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* To qualify as "repeated episodes of decompensation, each of extended duration," evidence must show "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.*

After making a determination as to Listing 1.04, the ALJ considered medical equivalency to Listings 12.04, 12.08, and 12.09. (AR 15.) As previously discussed, the ALJ examined the "paragraph B" criteria, and determined that Emery's "mental impairments d[id] not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation." (*Id.*) Emery now lists eight instances that

he alleges qualify as repeated episodes of decompensation, each of an extended period. (*See* Doc. 28 at 23-24.) It is clear, however, that some of this evidence, such as Emery's homelessness and divorce, has no relevance in determining whether it met the regulatory definition of "episodes of decompensation." (*See id.* at 24.) Furthermore, other occurrences that could arguably qualify as decompensation, such as Emery's hospitalization from July 22 to July 27, 2007 after having suicidal thoughts, or his hospitalization on November 30, 2008 for right leg spasms, do not satisfy the durational two-week requirement or alternatively, did not occur within the same year. (Doc. 28 at 24; AR 346-47, 495.) Thus, the ALJ did not err in his determination that there were no episodes of decompensation.

### F. PTSD

Lastly, Emery contends that the ALJ erred when he failed to consider whether Emery's PTSD met or medically equaled Listing 12.06. (*See* Doc. 28 at 25.) This claim also lacks merit.

The ALJ found that Emery had the severe impairment of PTSD, but indeed failed to discuss Listing 12.06. (*See* AR 13, 14-16.) Generally, an ALJ must provide an explanation as to why the claimant failed to meet or equal the Listings at step three, so long as "the claimant's symptoms, as described by the medical evidence appear to match those described in the Listings." *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. 2002). Nevertheless, "if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a [l]isting, a [c]ourt may still uphold the ALJ's determination if it is supported by substantial evidence." *Cooper v. Astrue*, No. 7:09-CV-0062 (TJM/VEB),

2010 WL 2985973, at *6 (N.D.N.Y. May 27, 2010) (citing *Berry v. Schweiker*, 675 F.2d

464, 468 (2d Cir. 1982)).  Thus, the issue is whether substantial evidence supports a

finding that Emery's impairment does not meet or equal Listing 12.06.

Listing 12.06, which pertains to anxiety-related disorders, requires:

A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of
four of the following signs or symptoms:
    a. Motor tension; or
    b. Autonomic hyperactivity; or
    c. Apprehensive expectation; or
    d. Vigilance and scanning;
or
2. A persistent irrational fear of a specific object, activity, or
situation which results in a compelling desire to avoid the dreaded object,
activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden
unpredictable onset of intense apprehension, fear, terror and sense of
impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of
marked distress; or
5. Recurrent and intrusive recollections of a traumatic
experience, which are a source of marked distress . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.

In March 2006, Dr. Eric Chapman diagnosed Emery with a depressive disorder

and noted that "[t]here does appear to be stress in [Emery's] house."  (AR 271.)  In July

2007, Dr. Scott McMahon stated that Emery had "a 1-year history of what looks like a

dysthymic mood which progressed to a depressed mood one month ago."  (*Id.* at 357.)

Dr. McMahon observed that, at that time, Emery met "the criteria for a major depressive

disorder although it [was] not clear with his recent opiate abuse whether he would meet

the criteria when he was not using chemicals of abuse or alcohol."  (*Id.*)  Anne Baylock, a

psychiatric nurse practitioner, opined in September 2007 that, although Emery "appear[ed] to have recently experienced an exacerbation of symptoms related to a chronic anxiety disorder and some character pathology," he was "coping relatively well" after being admitted to Rutland Regional Medical Center. (*Id.* at 387.) In addition, Dr. Philip Walls, a non-examining consultant physician, opined that Emery's "mental impairments were non-severe" after examining the medical evidence. (*Id.* at 422.) Finally, Dr. Mooney concluded that Emery had "no cognitive impairment," that his "attention and concentration were sound," and that his "[r]eading and writing were normal." (*Id.* at 659.) As none of this—or any other—objective medical evidence establishes the specific symptoms of Listing 12.06 or documents a disorder that is medically equivalent thereto, the ALJ's failure to discuss this issue was harmless. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.06; *Berry*, 675 F.2d at 468.

## II.      RFC Determination

Emery also challenges the ALJ's RFC determination at step four of the sequential analysis on five different grounds.

### A.      Claimant Credibility

Emery first claims that the ALJ erred in his RFC determination when he failed to properly assess plaintiff's credibility. (*See* Doc. 28 at 25.) He contends that the ALJ impermissibly discounted his credibility based solely on his overuse of prescribed medications and abuse of illegal drugs. (*Id.*) He also claims that the ALJ inadequately considered his complaints of back pain. (*Id.*) Emery maintains that his substance abuse

problems are not relevant because they did not begin until months after his alleged onset date.  (*Id.*)  These claims lack merit.

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  *See* 20 C.F.R. § 404.1529.  At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  *Id.* at § 404.1529(b).  That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a); *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d. Cir. 1983) ("[D]isability requires more than mere inability to work without pain.  To be disabling, pain must be so severe . . . as to preclude any substantial gainful employment.").  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. 20 C.F.R. § 404.1529(a).  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in . . . administrative proceedings."  20 C.F.R. § 404.1512(b)(3); *see also* 20 C.F.R. § 404.1529(a).

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted).  If the

Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain. *Id.* (citing *McLaughlin v. Sec'y of HEW*, 612 F.2d 701, 704 (2d Cir. 1982)). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). An important indicator of the credibility of a claimant's statements is their consistency with other information in the record, including the claimant's medical treatment history. *Id.* at *5-6.

At step four, the ALJ found that Emery's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Emery's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the RFC.]" (AR 17.) The ALJ explained that "the medical evidence regarding [Emery's] low back problem does not support the claimant's assertions of disabling severe pain present on a constant basis as he alleges." (*Id.*) Specifically, the ALJ accurately cited Emery's reported ability to walk a fair distance, as well as Emery's FCE, which showed a capacity for light work. (*Id. at* 17, 310, 318, 520.)[4]

---

[4] Emery characterizes the ALJ's credibility determination as solely based on his history of drug abuse. (*See* Doc. 28 at 26.) Although the ALJ did state that Emery's "overuse of prescribed medications and use of illegal drugs does undermine his credibility" (AR 17), the ALJ additionally performed the required credibility analysis, as described above (*see id.*). It is clear, therefore, that Emery's drug abuse was not the only basis for the ALJ's determination. Furthermore, an ALJ is permitted to consider a claimant's drug-seeking behavior when evaluating credibility. *See Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009)).

In addition to the evidence cited by the ALJ, there are numerous inconsistencies between Emery's purported symptoms and the objective medical evidence. Dr. Dunn specifically noted the inconsistency between Emery's reported pain and his physical ability. (AR 496.) Similarly, a physical therapy summary from Rutland Regional Medical Center stated that Emery's MRI results did not coincide with his symptoms. (*Id.* at 514.) Dr. Daniel Botsford, a consultant doctor who examined Emery, found that "the reason for his deterioration [was] obscure." (*Id.* at 252.) As early as March 2006, Dr. Ahn noticed that Emery displayed "a lot of . . . pain-focused behavior and [a] focus on disability." (*Id.* at 227.) Finally, Emery's FCE concluded that his assertion of "very significant pain . . . was not fully reflected in his movement patterns or postures," indicating "fear-avoidance behavior." (*Id.* at 318.) The FCE also noted Emery's score of 54 points on his Pain Anxiety Symptoms Scale and stated that such a high score on the test "frequently correlate[s] to hyper[-]vigilance to pain, fear[-]avoidance behavior and high anxiety concerning pain provocation that may limit functional activity more than acute pain itself." (*Id.* at 321.) The ALJ's credibility determination, therefore, is supported by substantial evidence and is not contrary to law.

## B.    PTSD

Next, Emery contends that the ALJ's failure to include limitations for Emery's PTSD in the RFC determination was legal error. (*See* Doc. 28 at 27.) This claim lacks merit.

At step four, the regulations require the ALJ to determine whether a claimant's RFC precludes the performance of his past relevant work. *See* 20 C.F.R. §§ 404.1520(f),

416.920(f).  A claimant's RFC is "the most [he] can still do despite [his] limitations."  20

C.F.R. § 404.1545(a)(1).  When a claimant has multiple impairments, the regulations

require the ALJ to "consider all of [the claimant's] medically determinable impairments

of which [he is] aware, including [a claimant's] medically determinable impairments that

are not 'severe' . . . ."  *Id.* at § 404.1545(a)(2).  Finally, case law is clear that a finding of

severity at step two does not necessitate a particular nonexertional limitation's inclusion

in the RFC.  *See Malloy v. Astrue*, No. 3:10cv190(MRK)(WIG), 2010 WL 7865083, at

*17 (D. Conn. Nov. 17, 2010) (providing that "the limitations identified in paragraph 'B'

are not the same as an RFC assessment, which requires a more detailed assessment of

work-related functions").

Despite Emery's claim to the contrary, the ALJ clearly considered Emery's mental

impairments when making the RFC determination.  (*See* AR 17.)  Specifically, the ALJ

included in his RFC determination the nonexertional limitations of being able to perform

only "repetitive unskilled work tasks" and "avoid[ing] exposure to hazards."  (*Id.* at 16.)

Record evidence indicates that Emery could vacuum, do the laundry, load the

dishwasher, and drive 300 miles a week.  (*Id.* at 322.)  Additionally, Emery could bathe,

dress, and groom himself.  (*Id.*)  These activities, in combination with the previously

discussed objective medical evidence regarding Emery's mental impairments, support the

ALJ's RFC determination.  The ALJ did not err, therefore, by failing to include

additional nonexertional limitations based on Emery's PTSD.

### C. The Opinion of Consultant Dr. Dean Mooney

Emery also claims that substantial evidence does not support the ALJ's decision to omit a nonexertional limitation reflecting his inability to interact with the public. (*See* Doc. 28 at 27.) Specifically, Emery argues that the ALJ erroneously gave considerable weight to Dr. Mooney's opinion, yet ignored the aspect of the opinion that found Emery's condition moderately affected his ability to interact with the public. (*Id.*) This argument fails.

In his report, Dr. Mooney stated that Emery's "[s]ymptoms of anxiety increase[d] greatly when in public [and] confronted with crowds." (AR 666.) Based on this observation, Dr. Mooney opined that Emery's ability to interact appropriately with the public was "moderately" affected by his impairment. (*Id.*) The definition of "moderate," however, was "more than a slight limitation in this area but the individual is still able to function satisfactorily." (*Id.* at 665.) Thus, Dr. Mooney clearly concluded that Emery could function satisfactorily in public despite his mental impairments.

### D. The Need to Change Positions

Next, Emery claims the ALJ's RFC determination is not supported by substantial evidence because it does not include his need to frequently change position. (*See* Doc. 28 at 28.) Emery contends that "the medical record reveals medically supported chronic low back and radicular leg pain which is relieved with frequent change of position." (*Id.*) As discussed earlier, the objective medical evidence does not establish that Emery needed to change positions or posture more than once every two hours. *See supra*, Sect. (I)(A). Furthermore, "light work requires intermittently standing or walking for a total of

approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009). Thus, even if the medical evidence supported Emery's purported need to frequently change position, an RFC of light work would not necessarily be contrary to that limitation.

### E.    Treating Physicians

Emery also claims that the ALJ erred when he failed to credit the opinions of certain treating physicians. (*See* Doc. 28 at 28.) Specifically, Emery argues that the opinions of Drs. Batlivala and Ahn support a determination that Emery could not return to work. (*Id.*) Additionally, he alleges that the comments of Drs. Zmurko and Gammons regarding his pain, support a finding of disability. (*Id.*)

Generally, "[w]ith respect to the nature and severity of [a claimant's] impairment(s) . . . [t]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations and internal quotation marks omitted). Nevertheless, it is clear that a "standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record" if unexplained. *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

On December 27, 2005, treating physician Dr. Ahn completed a New Hampshire Worker's Compensation Medical Form on Emery's behalf and checked a box indicating that he had no work capability. (AR 230.) On January 3, 2006, treating physician Dr. Batlivala completed an identical form and similarly checked the same box. (*Id.* at 461.)

Nearly a month earlier, however, on December 6, 2005, Dr. Batlivala filled out the same form and indicated that Emery could perform modified sedentary work.  (*Id.* at 462.)  Eight months later, on August 30, 2006, treating physician Dr. Jouve assessed that Emery could "return to work full time full duty."  (*Id.* at 310.)  These checked boxes on standardized forms do not establish a disability because they do not support the finding of an impairment that "lasted . . . for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Nor does the additional evidence cited by Emery support his claim.  On December 29, 2008, Dr. Zmurko examined Emery and noted that "[t]his pain is limiting his activities of daily living," but the Doctor did not state that Emery could not work.  (AR 528.)  Furthermore, in the same report, Dr. Zmurko concluded that Emery's "disc herniation is not very significant."  (*Id.*)  On October 20, 2008, Dr. Matthew Gammons stated that "[a]t this point, he is unable to work, secondary to his pain."  (*Id.* at 522.)  Although Emery characterizes this statement as Dr. Gammons's diagnosis, when read in context, it is clearly Dr. Gammons's summary of the facts as reported by Emery.  (*See id.*)  Later in the report, Dr. Gammons concluded that "[r]eview of systems is otherwise negative.  There are no red flag symptoms."  (*Id.*)  Because this evidence does not support a finding of disability, the ALJ did not err in failing to discuss it.  *See Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir.* (providing that "an ALJ is not required to discuss every piece of evidence") (citation omitted)).

### III. Nonexertional Limitations

Finally, Emery claims that the ALJ erred at step five of the sequential analysis when he relied on the Medical Vocational Guidelines ("the Grids") in lieu of eliciting testimony from a vocational expert. (*See* Doc. 28 at 29.) This claim lacks merit.

The regulations require the ALJ to determine at step five whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). "In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to [the Grids]." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation marks omitted). It is clear, however, that the Grids are not conclusive when a claimant suffers from certain nonexertional limitations. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (holding that the Grids "may not be controlling [because] the guidelines [cannot] provide the exclusive framework for making a disability determination" if a claimant "suffered from additional nonexertional impairments" (internal quotation marks omitted)). Rather, in these cases, the "application of the [G]rid guidelines and the necessity for expert testimony must be determined on a case-by-case basis." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). Thus, "[i]f a claimant has nonexertional limitations that *significantly limit* the range of work permitted by his exertional limitations, the ALJ is required to consult with a vocational expert." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (emphasis added and internal quotation marks omitted).

The ALJ found that Emery's RFC included the nonexertional limitation of "simple, repetitive unskilled work tasks and should avoid exposure to hazards." (AR 16.) The ALJ concluded at step five, however, that these "additional limitations have little or

no effect on the occupational base of unskilled light work." (*Id.* at 18.) Thus, the ALJ found Emery to be not disabled, as directed by the Grids, because he could perform all or substantially all of the exertional demands of unskilled light work. (*Id.*)

The regulations define unskilled work as "work which needs little or no judgment to do *simple duties* that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a) (emphasis added). For this reason, courts have held that the nonexertional limitations of simple tasks and avoidance of hazards do not significantly reduce a claimant's ability to perform unskilled work. *See Benitez v. Astrue*, No. 04 Civ. 5188(RJS), 2008 WL 2216276, at *11 (S.D.N.Y. May 23, 2008) (holding that reliance on the Grids was appropriate when a claimant's nonexertional limitations included simple work); *Garcia v. Astrue*, No. 3:09-CV-319 (CFD)(TPS), 2010 WL 1072350, at * 4 (D. Conn. Feb. 18, 2010) (holding that reliance on the Grids was appropriate when a claimant's nonexertional limitations included working in a low stress environment); *Gonzalez v. Astrue*, No. 06-cv-5403 (DLI), 2008 WL 4453166, at *9 (E.D.N.Y. Sept. 30, 2008) (holding that reliance on the Grids was appropriate when a claimant's nonexertional limitations included a need to avoid various hazards). The ALJ, therefore, did not err when he relied solely on the Grids at step five of the sequential analysis because the evidence demonstrates that Emery's nonexertional limitations did not significantly limit his ability to perform light work.

## Conclusion

For the reasons stated above, I recommend that Emery's Motion for an order reversing the Commissioner's decision and remanding for further proceedings (Doc. 21)

be DENIED; and the Commissioner's Motion for an order affirming such decision (Doc. 33) be GRANTED.

Dated at Burlington, in the District of Vermont, this 9th day of April, 2012.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).